IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CTCOA, LLC d/b/a OLYMPIC AVIATION | § § § | |
| *Plaintiff*, | § § | Civil Action No. 4:22-cv-03297 |
| v. | § § | JURY TRIAL DEMANDED |
| NSL HOLDINGS, INC. d/b/a NSL AEROSPACE | § § § § | |
| *Defendant.* | § § | |

**PLAINTIFF'S VERIFIED MOTION AND INCORPORATED MEMORANDUM OF LAW REQUESTING A TEMPORARY RESTRAINING ORDER, AND REQUEST FOR EXPEDITED DISCOVERY AGAINST NSL**

Plaintiff CTCOA, LLC d/b/a/ Olympic Aviation ("Olympic") moves this Court for a Temporary Restraining Order against Defendant NSL Holdings, Inc. d/b/a NSL Aerospace ("NSL") pursuant to Federal Rule of Civil Procedure 65(b). Plaintiff also moves this Court for an Order granting its request for Expedited Discovery.

## I.    INTRODUCTION

This case concerns a direct competitor stealing confidential and proprietary information in order to gain a competitive advantage in the marketplace. NSL worked through two departing Olympic employees who exported confidential and trade secret information about thousands of customers from Olympic's enterprise resource planning ("ERP") system in the weeks leading up to their departure. The employees' exports included highly sensitive customer lists, detailed customer and vendor contact information, pricing information, profit margin information, years of sales and purchase order histories, and product sourcing information that Olympic has compiled

1

over many years, and which Olympic uses to establish its competitive edge. Olympic's former employees provided this information directly to NSL who is using it to compete against Olympic.

NSL actively participated in, facilitated, and encouraged the departing Olympic employees' misconduct and theft of trade secrets. Injunctive relief is routinely granted when departing employees misappropriate trade secrets and violate their contractual obligations, and then take that pilfered information to their new employer. This is one of those cases. Olympic therefore respectively requests a temporary restraining order prohibiting any use of Olympic's confidential trade secret information by NSL or any of its employees, and expedited discovery before a preliminary injunction hearing.

## II. FACTUAL BACKGROUND

### A. OLYMPIC AVIATION IS A SUCCESSFUL DISTRIBUTOR OF AEROSPACE EQUIPMENT.

Olympic is a premier aerospace distributor that has been in business for over 50 years.[1] Olympic sells parts, chemicals, and raw materials to customers in the aerospace industry. And although Olympic does some manufacturing in-house, most of the goods Olympic sells are sourced from third-party vendors. (*See* Declaration of Lisa Hong ¶ 9). Put simply, Olympic purchases goods from third-party vendors in order to fulfill customer orders. (*Id.*)

Olympic is well known in the industry for being able to "source" hard-to-find goods, meaning it is able quickly to find the correct identifying information for a requested product and can locate a vendor that can supply the product in a timely and cost-effective manner. (*Id.* ¶ 10). This capability is important because product identifiers (e.g., part numbers) often change, as do vendors for a given product. (*Id.* ¶ 11). Olympic's ability to source products is one of its key competitive advantages in its industry space. (*Id.* ¶ 12).

---

[1] Olympic has had several predecessor entities. CTCOA LLC acquired substantially all of the assets of its predecessor in May 2018.

Olympic stores its sourcing information in its ERP system, an electronic database that contains a large amount of information including sales order and purchase order information. (*Id.* ¶¶ 13-14). The information in ERP includes:

- *Sales Order Information*. The ERP contains many years of sales order information, including records of all sales Olympic has made to customers since at least as early as 2008. This information includes for each sale, sales order number, account number, purchase order number, customer name, customer contact information, relevant dates, including date of order and shipment, shipping information, part number and description, the Olympic employee who handled the sale, order status, unit pricing, and total price. (*Id.* ¶ 15).

- *Purchase Order Information.* The ERP also contains many years of purchase order information, including records of all purchases Olympic has made to fulfil customer orders since at least as early as 2008. This information includes for each purchase order, purchase order number and other reference numbers, order and shipment dates, vendor names, vendor contact information, the Olympic employee who handled the sale, shipping information, order status, part number and description, unit price, and total price. It also contains information about back orders. (*Id.* ¶ 16).

Each time Olympic completes a transaction, it enters data from the transaction into the ERP. (*Id.* ¶ 17). In addition, each time Olympic sells customer product not already in Olympic's ERP system, it adds additional information to its already robust database. (*Id.* ¶ 18).

The ERP gives Olympic a significant competitive advantage because Olympic can use it to quickly source a wide variety of goods, using decades of past transaction history and sourcing research. (*Id.* ¶ 20). In other words, the ERP is the "lifeblood of Olympic's business." (*Id.* ¶ 21).

For that reason, Olympic guards the contents of the ERP as its confidential and trade secret information. (*Id.* ¶ 23).

### B. STEPS TAKEN TO PROTECT AND PREVENT DISCLOSURE OF OLYMPIC'S CONFIDENTIAL INFORMATION.

Olympic takes reasonable steps to guard the secrecy of its ERP database and to protect its significant, long-term investments in developing and compiling the information stored within the ERP. (Hong Decl. ¶ 23). This process begins on day one. When employees are onboarded, they are given an employee handbook, which discusses the importance of confidentiality. (*See* Declaration of Gil Apodaca ¶ 6). During the onboarding process, employees are informed that they are prohibited from sending customer information, vendor information or sales data to any external source. In addition, employees are told they should be particularly mindful of not sending any such information to competitors, vendors or customers. (*Id*. at ¶ 7).

After onboarding, Olympic employees—including Peter Pi and Edward Chiao—sign agreements that prohibit the unauthorized access, use, or dissemination of Olympic's confidential information. (*Id*. ¶ 8). For example, in their Agreements, Mr. Pi and Mr. Chiao promised to "not disclose any…trade secrets, directly or indirectly, or use them in any way, either during the term of [their] employment or at any time thereafter, unless for a purpose authorized by management." (*Id*). The agreement specifically states that Olympic's confidential information includes "reports, quotations, price schedules, devices, inventions, processes, compilations of information, records, specifications and information concerning customers, agents and vendors." (*Id*).

When it comes to its ERP system, Olympic takes multiple overlapping measures to protect its stored information. (Hong Decl. ¶ 23). First, the ERP is password protected. Each Olympic employee with a need to access the system is issued a unique password to access the system. Second, the ERP can only be accessed from Olympic-issued computers or through a VPN (virtual

private network) for select employees, which is also password-protected. The passwords for Olympic computers and VPN are different than the passwords for the ERP. The company in its sole discretion restricts or removes access under certain circumstances. Third, access to the ERP system is restricted to the subset of Olympic employees with a need to access the system within the scope of their employment. Such employees include, for example, sales and finance employees. Fourth, even for employees permitted to access the ERP system, access is restricted on the basis of need, such that employees can only access the information in the ERP they need to perform their jobs. For example, although employees in the shipping department can access some portions of the ERP, they are not permitted to access financial information because they do not have a need for that information to fulfil their job responsibilities. Fifth, Olympic requires all employees, including employees with access to the ERP, to execute a confidentiality agreement covering information within the ERP upon hiring.

Olympic clearly goes to great lengths to protect and prevent the disclosure of its confidential and trade secret information because disclosure would substantially reduce or eliminate the value of the information. If this confidential information were to fall into the hands of a competitor or others familiar with the industry, they could use information from Olympic's ERP system to source orders and to systematically target Olympic customers and undercut Olympic on price. (*Id.* ¶ 86). In other words, Olympic's competitors could effectively use and profit from Olympic's years of labor and investment without incurring any of the time and expense required to develop the confidential information.

C. **PETER PI AND EDWARD CHIAO RECEIVED CONFIDENTIAL INFORMATION TO FULFILL THEIR JOB RESPONSIBILITIES AT OLYMPIC.**

Peter Pi and Edward Chiao began their employment with Olympic in June 2020 and most recently and respectively held the positions of Regional Sales Manager and Sales Manager at

Olympic. (*Id*. ¶ 29). As part of their employment with Olympic, both Mr. Pi and Mr. Chiao signed a Confidentiality Agreement. (Apodaca Decl., ¶ 8).

As Sales Managers for Olympic, Messrs. Pi and Chiao were expected to procure and manage Olympic customer accounts and sales. They also played an integral part in meeting with customers and prospects, analyzing their needs, and preparing comprehensive, cost-effective, and competitive bids for Olympic products and services. In connection with their responsibilities, Mr. Pi and Mr. Chiao were entrusted with access to the ERP—Olympic's most sensitive information—to support their sales efforts. (Hong Decl. ¶ 23). This information is used in and intended for use in interstate commerce, including to provide pricing information, sources and to prepare bids on prospective projects. (*Id.*).

> D. AS MR. PI AND MR. CHIAO WERE TRANSITIONING TO NSL, THEY GENERATED NUMEROUS FILES GENERATED FROM THE ERP AND SENT THEM TO NSL.

In the leadup to their departure from Olympic, Messrs. Pi and Chiao took large amounts of Olympic's confidential information, much of it from Olympic's ERP system, and shared much, if not all, of this information with NSL. For example:

- ➢ On July 20, 2022, at 4:01 p.m., Mr. Pi exported a PDF from Olympic's ERP system entitled "2021.pdf" (Apodaca Decl. ¶ 12). This document is a 305 page Sales Order Journal. It shows detailed information about sales by Mr. Pi, Mr. Chiao, and two other members of their team from 2021 by customer name, part number, part description, dates of order and shipment, and pricing information. In essence, 2021.pdf shows each sale Mr. Chiao, Mr. Pi, or their team members were involved with in 2021, with part-specific information, pricing, and customer contact information. This is highly confidential material of Olympic. Mr. Pi emailed this document to his personal gmail

6

account July 20, 2022 at 5:11 p.m. Mr. Pi did not have authorization to download or share this information with NSL. (*Id.* ¶ 7).

- On July 20, 2022, at 3:50 p.m., Mr. Pi exported a PDF from Olympic's ERP system entitled "2022.pdf." (*Id.* ¶ 12). This document is another 232 page Sales Order Journal. It shows detailed information about sales by Mr. Pi, Mr. Chiao, and two other members of their team from 2022 by customer name, part number, part description, dates of order and shipment, and pricing information. In essence, 2021.pdf shows each sale Mr. Chiao, Mr. Pi, or their team members were involved with in 2021, part-specific information, pricing, and customer contact information. This is highly confidential material of Olympic. Mr. Pi emailed this document to his personal gmail account on July 20, 2022 at 5:01 p.m. Mr. Pi did not have authorization to download or share this information with NSL. (*Id.* ¶ 7).

- On July 21, 2022, NSL emailed Mr. Chiao's personal email account asking for a quote of a CN44 Cleaning Solvent. (*Id.* ¶ 13). This request represented a request to source a product for NSL using Olympic's confidential and trade secret sourcing information. Mr. Chiao did not have authorization to do so. (*Id.* ¶ 7).

- On July 22, 2020, NSL asked Mr. Chiao to assist with a request, stating "anything you can do is greatly appreciated." (*Id.* ¶ 13). Two days later, NSL sent the request to both Mr. Chiao's work email and personal email saying the customer was "relentless" and asking for assistance. This request represented a request to source a product for NSL using Olympic's confidential and trade secret sourcing information. Mr. Co did not have authorization to do so. (*Id.* ¶ 7).

7

- On July 26, 2022 at 8:10 a.m., Mr. Pi exported at PDF from Olympic's ERP system entitled "1.pdf" This document is a 263 page Sales Order Register. (*Id.* ¶ 12). It shows detailed information about sales by Mr. Pi, Mr. Chiao, and three other members of their team from between 2020 and 2022 by customer name, dates of order and shipment and total amount invoiced. In essence, 1.pdf shows each sale Mr. Chiao, Mr. Pi, or their team members were involved with during their time at Olympic, including customer name and contact information. This is highly confidential material of Olympic. (Hong Decl. ¶ 32). Mr. Pi emailed this document to his personal gmail account on July 26, 2022 at 9:16 a.m. Mr. Pi did not have authorization to download or share this information with NSL. (Apodaca Decl. ¶ 7).

- On July 26, 2022, at 10:34 a.m. Mr. Pi sent Powell Simbulan of NSL a message stating that "I was testing to see if I can attach a PDF or something. I don't think I can so I just send another Share Link for PDF. Let me know if you didn't receive the link." (*Id.* ¶ 12).

- On July 26, 2022, Powell Simbulan of NSL shared a document with Mr. Chiao and Mr. Pi and invited them to "comment" on it. Moments later, it shows Mr. Pi sharing documents. Documents obtained from Mr. Chiao's computer show that Mr. Pi shared the following documents with NSL: (a) a document titled "1.pdf" on July 26, 2022 at 9:57 a.m.; (b) a document entitled "E Chemical.pdf" on July 26, 2022 at 3:59 p.m.; (c) a document entitled "P Parts.pdf" on July 26, 2022 at 3:58 p.m., an 87 page document showing each purchase order Mr. Pi was involved with during his time working at Olympic, including purchase order number, reference numbers, vendor name, vendor

contact information, relevant dates, including order date and delivery date, order status, quantity, and price. This is highly confidential material of Olympic. (*Id.* at ¶ 13).

- On August 1, 2022, Mr. Pi modified a spreadsheet entitled "Peter Group – Open SO through July 13, 2022.xlsx." This document appears to have been generated from Olympic's ERP system. This document shows hundreds of service orders submitted by scores of customers, the quantities of items ordered as well as the quantities of items backordered. This is highly confidential material of Olympic. Mr. Pi did not have authorization to download or share this information with NSL. (*Id.* ¶ 12).

- On August 12, 2022, at 9:11 a.m. Mr. Pi emailed a document to his personal gmail account titled "1234." It contains a list of many of Olympic's customers from Korea and other entities operating in Southeast Asia. This is highly confidential material of Olympic. Mr. Pi did not have authorization to download or share this information with NSL. (*Id.*)

- On August 12, 2022, at 9:11 a.m. Mr. Pi emailed another document to his personal gmail account titled "1234." It contains an expanded list of many of Olympic's customers. This is highly confidential material of Olympic. Mr. Pi did not have authorization to download or share this information with NSL. An undated native Excel document entitled "DataExport" which shows details of hundreds of Olympic's customer transactions that occurred in July and August 2022 was found in Mr. Chiao's web browser download history. This file contains detailed shipping information for Olympic's customers. It was downloaded to Mr. Chiao's work computer on August 16, 2022, about 30-minutes before he left the office for the day. This file contained highly

confidential information. Mr. Chiao did not have authorization to download or share this information with NSL. (*Id.*)

There is no legitimate reason for any sales employee of Olympic to generate any reports like those described above. (Hong Decl. ¶ 49).

     **E.**    **NSL IGNORED OLYMPIC'S DEMANDS AND CONTINUED TO WRONGFULLY SEEK CONFIDENTIAL AND PROPRIETARY INFORMATION FROM OLYMPIC.**

On August 26, 2022, Olympic's counsel sent a demand letter to NSL, detailing some of the evidence it had uncovered, and the concerns it raised. (*See* August 26 Demand Letter, attached to the Complaint as Exhibit C). The demand letter also attached Messrs. Chiao and Pi's confidentiality agreements. In the letter, Olympic demanded that NSL immediately cease all access, use, or disclosure of Olympic materials and information, and requested the return of all such materials to ensure that they were not being copied for future use.

The demands fell on deaf ears. On September 1, 2022—nearly a week after receipt of the demand letter—NSL employees sent two separate requests attempting to source product orders to Mr. Chiao and Mr. Pi's Olympic email accounts. (Hong Decl. ¶ 95 & Ex. A). Those requests were apparently sent to Mr. Pi and Mr. Chiao's Olympic email accounts by mistake. And to leave no doubt that NSL employees knew this conduct was wrong, NSL sought to recall the messages multiple times in the eight minutes that elapsed after they were sent as they had realized their error. (*Id.* ¶ 96 & Ex. B). Despite being aware of Mr. Pi and Mr. Chiao's confidentiality obligations, as well as their unlawful possession of Olympic's confidential information, NSL continues to work in a manner that allows it to engage Olympic customers and to rely on the information misappropriated from Olympic.

Olympic has spent more than 50 years developing the knowledge, database and contacts necessary to source a wide variety of goods, and has developed a reputation in the industry for its

ability to source hard-to-find items. Much of this knowledge and acumen is stored in Olympic's ERP system, which keeps detailed records of Olympic's current sourcing vendors for all of its products. *See generally* Dec. of Lia Hong. That information has been taken and is being used by a direct competitor. Now, despite attempts to resolve this matter, NSL's actions have left Olympic no choice but to bring this action.

### III. LEGAL ARGUMENT

This Court should grant a Temporary Restraining Order to: (a) restrain NSL from using any confidential data from Olympic; (b) preserve any Olympic electronic data NSL has in its possession (or the possession of its employees or agents); (c) permit an independent forensic expert to inspect any servers, computers, or other devices that may contain Olympic electronic data; and (d) award any other relief this Court may deem proper.

This Court may grant a temporary restraining order if the movant shows: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Garza v. Starr Cnty.*, 309 F. Supp. 3d 454, 456 (S.D. Tex. 2018) (quoting *Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006). Here, Olympic has established all four elements.

### A. OLYMPIC HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

#### 1. *Olympic Will Prevail on its Defend Trade Secrets Act Claim.*

NSL's conduct violates federal trade secret law. The Defend Trade Secrets Act ("DTSA") creates a private civil cause of action for trade-secret misappropriation. *See* 18 U.S.C. § 1836(b). The DTSA authorizes a Court to grant equitable relief to a private party that has suffered a misappropriation of trade secrets "used in, or intended for use in, interstate or foreign commerce."

18 U.S.C. §§ 1836(b)(1), (3). To state a claim under the DTSA, a plaintiff must allege: (1) a trade secret; (2) misappropriation; and (3) use in interstate commerce. 18 U.S.C. § 1836; *Computer Scis. Corp. v. Tata Consultancy Servs. Ltd.*, No. 3:19-CV-970-L, 2019 WL 2058772, at *3 (N.D. Tex. May 9, 2019). The present case satisfies all elements.

*First*, trade secrets are at issue in this case. Under the DTSA, a "trade secret" includes "all forms and types of financial, business, scientific, technical, economic, or engineering information" when the owner has taken reasonable measures to keep that information secret and when that information "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). At issue in this case are large quantities of data taken by NSL, Mr. Chiao, and Mr. Pi from Olympic's ERP database. The ERP is made up of sales order information, purchase order information, customer lists, detailed customer and vendor contact information, specific pricing information, product sourcing information, profit margins, and other confidential information entitled to protection. As set forth above, Olympic has expended significant time, money, and effort in developing and maintaining its confidential and proprietary business information, which has been critical to its growth and staying power. (Hong Decl. ¶ 20). Given the importance of this information, Olympic has taken many reasonable measures to ensure the secrecy of this information, and this information is not in the public domain. (*Id.* ¶ 23).

*Second*, with the assistance of Mr. Chiao and Mr. Pi, NSL has misappropriated Olympic's trade secrets by requesting, obtaining, and using this information without Olympic's permission for the specific purpose of gaining a competitive advantage. (Hong Decl. ¶ 85; Apodaca Decl. ¶¶ 12-13). As stated previously, NSL have wrongfully obtained Olympic's materials and have used

them to solicit Olympic's former customers. (Hong Decl. ¶¶ 85-86; Apodaca Decl. ¶¶ 12-13). Further, Messrs. Pi and Chiao both agreed to protect all of Olympic's confidential information and to return any such information to Olympic before leaving the company and have failed to do so. (Apodaca Decl. ¶ 8). NSL is fully aware of that fact, and yet refuses to give up the documents and even attempts to seek more. (Hong Decl. ¶¶ 95-96).

*Third,* NSL plans to use or has already used Olympic's trade secrets in interstate commerce. "Use of a trade secret means commercial use by which a person seeks to profit from the use of the secret." *A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 909, 916 (S.D. Tex. 2015) (quoting *Gen. Universal Sys., Inc. v. HAL Inc.*, 500 F.3d 444, 450 (5th Cir. 2007))). "As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment of the defendant is a 'use.'" *Id*. As such, courts have found that "use" of a trade secret includes "soliciting customers through the use of information that is a trade secret" or "relying on the trade secret to assist or accelerate research or development." *Matter of AmeriSciences, L.P.*, 781 F. App'x at 310 (quoting *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 279 (5th Cir. 2012)).

NSL's actions clearly qualify as use. The evidence shows that NSL obtained large volumes of data from Olympic's ERP (Hong Decl. ¶ 32). The evidence also shows that NSL and the Former Employees plan to use this information to take Olympic's customers. (*Id.* ¶¶ 90-91) (discussing planning document contemplating taking "Tammy and Nina's business"). Indeed, the evidence shows that NSL has already begun to use this information to source customer RFQs. (Apodaca Decl. ¶¶ 12-13) (discussing NSL's requests to Former Employees to source product orders); (Hong Decl. ¶¶ 95-96) (discussing recalled sourcing requests sent after Former Employees left Olympic). And this use is in interstate commerce. Like Olympic, NSL does business across state lines. NSL's emails to Mr. Chiao and Mr. Pi demonstrate use of Olympic's confidential sourcing information

13

in interstate commerce. (Apodaca Decl. ¶¶ 12-13) (describing requests for Former Employees to source product for NSL). Accordingly, Olympic has a substantial likelihood of success on the merits of its trade secret misappropriation claim.

        *2.     Olympic Will Prevail on its Texas Uniform Trade Secrets Act Claim.*

For similar reasons, Olympic will prevail on its Texas Uniform Trade Secrets Act ("TUTSA") claim. Courts routinely consider DTSA and TUTSA claims together because they "require proof of the same elements." *Vest Safety Med. Servs., LLC v. Arbor Env't, LLC*, No. 4:20-CV-0812, 2022 WL 2812195, at *6 (S.D. Tex. June 17, 2022) (considering TUTSA and DTSA claims together). Having shown a likelihood of success on the merits of its DTSA claim, Olympic has also shown the same for its TUTSA claim.[2]

**B.    IRREPARABLE INJURY WILL RESULT UNLESS AN INJUNCTION ISSUES.**

Olympic needs an injunction to prevent irreparable harm. Courts have long held that the loss of a business' customers is an injury incapable of ascertainment in monetary terms and may thus be classified as irreparable. *See, e.g., Alliantgroup, L.P. v. Feingold*, No. H-09-0479, 2009 WL 1357209, at *2 (S.D. Tex. May 11, 1990) (finding that plaintiff "has shown a substantial threat of irreparable harm because of the loss of goodwill and customers and from the likely disclosure of confidential information that [defendant] acquired during his tenure at Alliantgroup"); *Miracle Appearance Reconditioning Specialists, Intern., Inc. v. Harris*, No. 4:07-CV-524-A, 2007 WL 3005638, at *2 (N.D. Tex. Oct. 11, 2007) (entering preliminary injunction against a defendant after plaintiff's showing that it would "suffer irreparable harm through the loss of customers and loss of goodwill").

---

[2] Olympic has a substantial likelihood on the merits of its other claims as well. However, given the focus on trade secrets in this Motion, Olympic focuses its briefing on its DTSA and TUTSA claims.

In addition, irreparable harm is presumed in cases where trade secrets have been misappropriated. *Glycobiosciences, Inc. v. Woodfield Pharm., LLC*, No. 4:15-CV-02109, 2016 WL 1702674, at *8 (S.D. Tex. Apr. 27, 2016). "When a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed." *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Ft. Worth 2005) (noting that "[t]he threatened disclosure of trade secrets constitutes irreparable injury as a matter of law.").

Here, NSL has clearly and intentionally retained Olympic's confidential trade secret information, which includes detailed customer lists and customer order information. (Hong Decl. 61). The emails from NSL to Mr. Pi and Mr. Chiao demonstrate the willingness of NSL to obtain these confidential materials and to utilize the information for its own benefit—some even after being warned by Olympic that such use would be illegal and improper. (Apodaca Decl. ¶¶ 12-13; Hong Decl. ¶¶ 95-96). Without an injunction, Olympic faces a serious risk that NSL will continue to use its confidential and trade secret information to steal its business and customer goodwill. Accordingly, to prevent further irreparable injury, a restraining order should issue.

### C. THE THREATENED INJURY OUTWEIGHS ANY THEORETICAL HARM THAT THE PROPOSED INJUNCTION COULD CAUSE NSL.

The requested temporary restraining order would not harm NSL. Indeed, Mr. Pi and Mr. Chiao agreed not to retain or use Olympic confidential information, and NSL has no legal right to possess confidential information that Mr. Pi and Mr. Chiao wrongfully took. Accordingly, because NSL has no legitimate claim to possess or have access to any confidential information related to Olympic's business, "the threatened injury of [Olympic's] trade secrets falling into the hands of a competitor outweighs the threatened harm to [NSL]." *See Indus. Insulation Group, LLC v. Sproule*, 613 F. Supp. 2d 844, 858 (S.D. Tex. 2009).

15

### D. GRANTING THE REQUESTED INJUNCTION IS NOT ADVERSE TO THE PUBLIC INTEREST.

Granting the temporary restraining order will not disserve the public interest. The legal protections afforded to trade secrets protect legitimate competition, encourage investment in business and innovation, and ultimately protect jobs. *See, e.g., TechniCAL, Inc. v. Allpax Products, Inc.*, No. 90-872, 1990 WL 41924, at *10, 12 (E.D. La. March 28, 1990); *Cambridge Strategics, LLC v. Cook*, No. 3:10-CV-2167-L, 2010 WL 5139843, at *7 (N.D. Tex. Dec. 17, 2010). The temporary restraining order Olympic seeks aims to protect these interests.

### E. PLAINTIFF ALSO REQUESTS AN ORDER GRANTING EXPEDITED DISCOVERY.

Federal Rule of Civil Procedure 26(d)(1) provides that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except . . . when authorized by these rules, by stipulation, or by court order." Fed. R. Civ. P. 26(d)(1). "A party seeking discovery prior to a Rule 26(f) planning conference by means of a court order must show 'good cause.'" *Burns v. City of Alexander*, No. 2:14-cv-350-MEF, 2014 WL 2440981, *1 (M.D. Ala. May 30, 2014). "Courts generally find good cause in cases in which there is potential spoliation of evidence, the plaintiff seeks a preliminary injunction, or in which unique circumstances exist that require immediate, limited discovery." *Id.*; *see also Earthbound Corp. v. MiTek USA, Inc.*, No. C16-1150 RSM, 2016 WL 4418013, at *11–12 (W.D. Wash. Aug. 19, 2016) (granting Plaintiff' motion for expedited discovery to "determine the full extent of Defendants' unlawful actions and [to] establish [Plaintiff'] right to a preliminary injunction").

Courts commonly order expedited discovery where, as here, a temporary restraining order is sought. *See, e.g., Intel Corp. v. Rais*, No. 1:19-CV-20-RP, 2019 WL 164958, at *7 (W.D. Tex. Jan. 10, 2019) (granting request for expedited discovery and temporary restraining order); *Document Operations, L.L.C. v. AOS Legal Techs., Inc.*, No. 20-20388, 2021 WL 3729333, at *2

16

(5th Cir. Aug. 23, 2021) (recounting that "the district court granted Doc. Ops.' TRO motion and its related request for expedited discovery"); *cf. SEC v. Resource Dev. Int'l, LLC*, 160 Fed. Appx. 368 (5th Cir. 2005) (parties engaged in expedited discovery in preparation for preliminary injunction hearing); *King Aerospace Commercial Corp., Inc. v. Al-Anwa Aviation, Inc.*, No. 3:08-CV-0999-L., 2009 WL 804122 (N.D. Tex. Mar. 25, 2009) (same); *Tracfone Wireless, Inc. v. King Trading, Inc.*, No. 3-08-CV-0398-B., 2008 WL 918243 (N.D. Tex. Mar. 13, 2008) (granting plaintiff leave to conduct expedited discovery in order to learn nature of defendants' conduct and decide whether to seek preliminary injunction).

Federal courts have held that expedited discovery is "reasonable" where the plaintiff seeks narrowly-tailored information necessary to decide a preliminary injunction motion. *Humphrey v. Sallie Mae, Inc.*, C/A No. 3:10-cv-01505-JFA, 2010 WL 2522743, at *1 (D.S.C. June 17, 2010) (expedited discovery request reasonable where information sought was "limited in scope and relevant to the subject matter of this case"); *Semitool, Inc. v. Tokyo Electron Am. Inc.*, 208 F.R.D. 273, 277 (N.D. Cal. 2002) (finding good cause for expediting discovery where narrowly-requested information "not otherwise accessible will substantially contribute to moving this case forward").

Here, good cause exists for the Court to order limited discovery prior to this hearing. Specifically, Defendants have actively tried and are trying to take business from Olympic and using confidential information from Olympic. (Hong Decl. ¶ 93). To determine the full scope of NSL's unlawful conduct, to ensure that all confidential data is returned, and to prepare for preliminary injunction proceedings, Olympic asks this Court to order expedited discovery. The expedited discovery Plaintiff seeks is as follows:

1. All documents that Messrs. Chiao and Pi have from their employment with Olympic.

2. All communications between NSL and/or Messrs. Chiao and/or Pi from January 1, 2021 to September 10, 2022.

3. All documents originating from Olympic in NSL's possession, custody, or control.

4. Depositions of Mr. Chiao, Mr. Pi, and Powell Simbulan.

## IV. CONCLUSION AND PRAYER

For these reasons, Olympic respectfully moves this Court to enter a Temporary Restraining Order for the later of fourteen (14) days or through the hearing date set by the Court on Olympic's request for a preliminary injunction:

(a) Requiring Defendant, NSL, to immediately return all confidential, proprietary, and trade secret information belonging to Olympic that is still within its possession (or the possession of any of its employees or agents), including but not limited to all information, files, and records that pertain to Olympic's business, customers, pricing, products, vendors, sales, and projects, including such information currently existing on any of Mr. Pi and Mr. Chiao's personal computers, external flash drives, cloud-based accounts, and other devices, or computers used by Mr. Pi and Mr. Chiao in connection with their employment at NSL;

(b) Prohibiting Mr. Pi and Mr. Chiao, as current NSL employees, from directly or indirectly possessing or engaging in any use or disclosure of confidential information belonging to Olympic, which includes trade secrets and other information that have been developed or used and/or will be developed or used by or for the benefit, or at the expense, of Olympic, that cannot be obtained readily by third parties from outside sources, in whatever form, tangible or intangible;

(c) Enjoining and restraining NSL and its employees or agents, including but not limited to Mr. Pi and Mr. Chiao, from directly or indirectly soliciting, contacting, diverting, appropriating, or entering into transactions with any Olympic customer identified by name in any of the misappropriated documents.

(d) Enjoining and restraining NSL and its employees or agents, including but not limited to Mr. Pi and Mr. Chiao from directly or indirectly inducing or urging any Olympic customer or vendor identified by name in any of the misappropriated documents, to discontinue, in whole or in part, its patronage or business relationship with Olympic.

(e) Requiring NSL to make available, within 48 hours, for forensic imaging any electronic device or cloud-based account, including flash drives, external hard drives, and computers, containing material relating to, belonging to or obtained from Olympic.

Dated:  September 26, 2022

Respectfully submitted,

*/s/ Benjamin F. Foster*
Benjamin F. Foster
Texas Bar No. 24080898
Southern ID No. 1998308
ben@fosteryarborough.com
**FOSTER YARBOROUGH PLLC**
917 Franklin Street, Suite 220
Houston, Texas 77002
Telephone: (713) 331-5254
Facsimile:  (713) 513-5202

**-AND-**

Charles W. Steese – *Pro Hac Vice Forthcoming*
Colorado Bar No. 26924
csteese@atllp.com
Alec Harris – *Pro Hac Vice Forthcoming*
Colorado Bar No. 47547
aharris@atllp.com
**ARMSTRONG TEASDALE, LLP**
4643 S. Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
Facsimile:  (720) 200-0679

*Counsel for Plaintiff CTCOA, LLC d/b/a Olympic Aviation*

## **CERTIFICATE OF SERVICE**

  This is to certify that a true and correct copy of the foregoing instrument has been served by certified mail and email on the following individuals on this 26th day of September 2022:

NSL Aerospace, through its counsel of record:
Matt Veech
BoyarMiller
2925 Richmond Ave., 14th Floor
Houston, TX 77098
mveech@boyarmiller.com

               */s/ Benjamin F. Foster*
               Benjamin F. Foster